559 F.2d 1339
 UNITED STATES of America, Plaintiff-Appellee,
v.
Gary ALEXANDER, Joseph Manuel Abella, Jr., Lawrence Ira
Tobac, John George Flynn, Jr., Cortlandt Warren Quimby, Jr.,
Thomas Charles Butler, Ira Spencer Pierce and Robert Arthur
Randall, III, Defendants-Appellants.
 No. 76-1401.
 United States Court of Appeals, Fifth Circuit.
 Sept. 30, 1977.
 
 1
 Jack R. Blumenfeld, Miami, Fla., for Alexander and Toback.
 
 
 2
 Fred Haddad, Fort Lauderdale, Fla., Peter F. K. Baraban, North Miami, Fla., for Randall and Pierce.
 
 
 3
 William P. Cagney, III, Miami, Fla., for Abella, Flynn, Quimby and Butler.
 
 
 4
 Robert W. Rust, U. S. Atty., Donald L. Ferguson, Asst. U. S. Atty., Miami, Fla., Jerome M. Feit, Mervyn Hamburg, Attys., Dept. of Justice, Crim. Div., App. Section, Washington, D. C., for plaintiff-appellee.
 
 
 5
 Appeals from the United States District Court for the Southern District of Florida.
 
 
 6
 Before MORGAN and HILL, Circuit Judges, and NOEL, Senior District Judge.*
 
 NOEL, Senior District Judge:
 
 7
 Appellants, along with two other defendants, were indicted in a three count indictment which charged all ten defendants with: (1) conspiring from dates unknown up to approximately March 5, 1975 to import marijuana and to possess marijuana with the intent to distribute, in violation of 21 U.S.C. §§ 846 and 963; (2) intentionally importing on or about March 5, 1975 into the United States forty-three hundred (4300) pounds of marijuana, in violation of 21 U.S.C. §§ 952 and 960; and (3) knowingly possessing said marijuana on March 5, 1975 with the intent to distribute, in violation of 21 U.S.C. § 841. All defendants filed timely motions to suppress. The district court granted the motion as to some of the evidence seized but denied the motion as to most of the marijuana. All defendants and the government waived their right to a jury trial and the matter was tried to the court.
 
 
 8
 Two of the defendants, Clark and Karnatz, were acquitted of all charges. Appellants Abella, Alexander, Butler, Flynn, Quimby, and Toback were found guilty of Count I (conspiracy) and Count III (possession). Appellants Randall and Pierce were found guilty of Count III (possession). Appellants contend primarily that the district court erroneously failed to suppress all of the seized marijuana. As in most search and seizure cases, the facts here are extremely important and therefore will be recounted in detail.
 
 
 9
 U. S. Customs Officer William LeCates met with a first-time confidential informant on February 22, 1975. The informant told LeCates that a shipment of 10,000 pounds of marijuana would be brought into the Stuart, Florida area north of Miami during the first week of March, 1975. The informant said that the marijuana would come in by boat and would be transferred to van-type vehicles for transportation to Miami. LeCates met with the informant again on February 28, 1975, at which time the informant reaffirmed the prior information and added that the marijuana would be brought down the south fork of the St. Lucie River.
 
 
 10
 On March 1, 1975, the Martin County Sheriff's Department was requested to investigate some "suspicious" individuals who were staying at the Holiday Inn in Stuart, Florida. Hotel employees were concerned about several individuals who were staying together at the hotel. These individuals had long hair, wore dirty, wrinkled, and torn clothing, were unshaven, yet possessed large amounts of cash. They were spending large sums of money and living above their apparent means. A deputy sheriff who went to the Holiday Inn pursuant to the hotel's request, found that only one out of the four license plate numbers listed by these individuals on the hotel registration cards matched the actual plates on the individuals' vehicles. This investigation was completely independent from any investigation concerning the possible marijuana shipment.
 
 
 11
 At about 9:00 p. m. on March 1, Customs Officer LeCates informed the Martin County Sheriff's Department about the possible marijuana shipment. LeCates told members of the sheriff's department what the informant had told him. He showed the officers a map of the general area where the transfer of the marijuana was to occur and he inquired if they knew of a Lost River Ranch in that area. The officers responded affirmatively, stating that the Ranch was on State Road 76 along the south fork of the St. Lucie River.
 
 
 12
 The next day, March 2, the sheriff's department, believing that there might be a connection between the individuals staying at the Holiday Inn and the marijuana shipment, began surveillance of these individuals. These individuals were driving a blue Chevrolet pickup with a camper shell on it, a Buick Riviera, a Mercedes-Benz, and a Plymouth.
 
 
 13
 On March 3, two campers, a Dodge Swinger, and an Open Road, were observed at Phipp's Park, a campground which is on the south fork of the St. Lucie River in the general vicinity where the marijuana shipment was to be transferred. The park director had called the sheriff's department about these campers since they had not been registered and were parked there without permission. These campers appeared to be abandoned; there was no activity around them throughout that day. The campers were put under surveillance.
 
 
 14
 Late in the evening of March 3, one of the vehicles under surveillance at the Holiday Inn was driven to Phipp's Park and one of the occupants then drove the Dodge Swinger camper from Phipp's Park back to the Holiday Inn. At 11:30 p. m., the Dodge Swinger and two of the vehicles under surveillance at the Holiday Inn were driven from the hotel to the Kantner residence, a residence on State Road 76 along the south fork of the St. Lucie River. This residence is about one mile from Phipp's Park and is in the immediate vicinity of the Lost River Ranch. Later that night, the Open Road camper was also driven to the Kantner residence. About 5:00 a. m. on March 4, the Dodge Swinger and the Open Road camper were driven back to Phipp's Park and abandoned. There was no activity around the campers during that day. That evening, however, a vehicle was driven from the Holiday Inn to the campground and the two campers were driven to the Kantner residence. The vehicles remained at the residence until early the next morning when they left. The two campers were taken back to Phipp's Park and again abandoned and the remaining vehicles went back to the Holiday Inn.
 
 
 15
 LeCates' informant had phoned him on March 3 and had said that the marijuana shipment would be coming in that night. However, early the next morning, the informant called back and said that the shipment could not be made because of boat problems or bad weather.
 
 
 16
 On March 5, LeCates informed the sheriff's department that the delivery would be made that evening after dark and that one of the boats which would be used to deliver the marijuana was named the Capricorn. At the hearing on the suppression motion, LeCates testified that he received the information as to the date and time of delivery from his confidential informant, but failed to testify as to the source of his information about the name of the boat. At 4:30 p. m., LeCates told the other law enforcement officers that the name of a second boat which would be used to make the delivery was the Widgeon. Again, LeCates failed to testify as to the source of his information concerning the name of the second boat.
 
 
 17
 At 6:30 p. m. on March 5, the Widgeon was observed coming up the south fork of the St. Lucie River towards the Kantner residence. Shortly thereafter, the Dodge Swinger camper was driven from the campground to the Kantner residence.[1] Other vehicles were later observed at the Kantner residence including a Dodge power wagon with an Open Road camper on it,[2] and three of the vehicles from the Holiday Inn that had been kept under surveillance, the Chevy pickup, the Mercedes-Benz, and the Buick Riviera.
 
 
 18
 At this time the Kantner residence was under surveillance, but the waterway behind the house was not visible to the officers conducting the surveillance. However, they did hear a boat revving up its engines on the waterway behind the house. At 8:46 p. m., the campers and other vehicles left the residence. The Dodge power wagon with the Open Road camper on it and the Mercedes-Benz proceeded east while the Dodge Swinger, the Buick Riviera and the Chevy pickup headed west.
 
 
 19
 All of the police officers conducting the surveillance were in constant radio contact with each other and upon hearing that the vehicles had left the residence began pursuing them. The first vehicle that was stopped was the Dodge Swinger. It was being followed by the Buick Riviera and when the Swinger was stopped, the Buick passed it and sped away at a high rate of speed. The occupants of the Swinger were immediately arrested and the camper was searched. Bales of marijuana were found in the camper and this information was communicated to the other police officers. The Buick, the Dodge power wagon-Open Road camper and the Mercedes were subsequently stopped. The Chevy pickup was never apprehended. Bales of marijuana were found in the Buick and the Dodge power wagon-Open Road camper.
 
 Probable Cause
 
 20
 The crucial issue is whether probable cause existed prior to the stopping of the Dodge Swinger. Since the informant's tip initiated the investigation, it is the starting point of the probable cause analysis. Appellants contend that the tip from an undisclosed and previously untested informant did not meet the tests of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). If probable cause is to be based primarily on an informer's tip, the Aguilar-Spinelli test requires that the reliability both of the informant and of his information be shown.
 
 
 21
 It is apparent that the tip itself did not provide sufficient indicia of reliability to satisfy Aguilar-Spinelli. There is no indication of how the informant obtained his information, whether by first-hand observation or otherwise. Furthermore, the reliability of the informant was unknown because he had never before supplied information. Nevertheless, the reliability of an otherwise defective tip may be established for purposes of Aguilar-Spinelli if independent investigation by law enforcement officers yields sufficient verification or corroboration of the information from the confidential source. United States v. Mendoza, 547 F.2d 952 (5th Cir. 1977); United States v. Tuley, 546 F.2d 1264 (5th Cir. 1977); United States v. Brennan, 538 F.2d 711 (5th Cir. 1976); United States v. Anderson, 500 F.2d 1311 (5th Cir. 1974).
 
 
 22
 In this case there was a failure of proof by the government as to crucial details of the tip and therefore it cannot be determined from the record to what extent the police surveillance verified the tip. The local police officers testified that Customs Officer LeCates had told them that the marijuana would be brought up the south fork of the St. Lucie River to the Lost River Ranch-Kantner residence area on two boats named the Capricorn and Widgeon.[3] On March 5, prior to the arrests and searches, the Widgeon was observed coming up the south fork of the river towards the Kantner residence. Thus, a material part of the information relayed by LeCates was verified prior to the arrests. However, LeCates failed to testify as to how he obtained the names of the boats. In particular, LeCates never testified that the names of the boats were supplied to him by the informant. While it may be likely that he received this information from the informant, the government's failure to present testimony to this effect makes it impossible to find that the reliability of the tip was sufficiently established by corroboration.
 
 
 23
 Even though the tip was not of sufficient reliability to establish probable cause by itself, that does not mean "that the tip was so insubstantial that it could not properly have counted" in the determination of probable cause. Spinelli v. United States, supra, 393 U.S. at 418, 89 S.Ct. at 590. It may be considered along with other factors which tend to show probable cause. See United States v. Tuley, supra; United States v. Squella-Avendano, 447 F.2d 575 (5th Cir. 1971), cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369. It is therefore necessary to determine whether the circumstances observed by the police officers during their surveillance were suspicious enough to provide probable cause.
 
 
 24
 Because of the tip, the police officers were on the watch for a smuggling operation in Stuart, Florida which ultimately unfolded before them. We conclude that probable cause existed when the arrests and searches took place, relying on the following facts. First, the movement of the vehicles between the Holiday Inn, Phipp's Park and the Kantner residence was not normal, innocent activity but rather was suspicious activity which suggested criminal conduct. Police officers need not personally observe overt criminal activity to have probable cause. The observation of unusual activity for which there is no legitimate, logical explanation can be the basis for probable cause. The movement of the campers from Phipp's Park each night for three consecutive nights and the return and abandonment the following mornings has no legitimate, logical explanation. The police were justified in relying on this activity as indicating criminal activity was underway. Second, the police officers conducting the surveillance at the Kantner residence observed the gathering of the vehicles from Phipp's Park and the Holiday Inn and then heard a boat on the waterway behind the residence. Third, all of the vehicles left the residence together but proceeded in opposite directions. Finally, when the Dodge Swinger was stopped, the Buick sped away at a high rate of speed. We hold that these facts and circumstances gave rise to probable cause to stop the Dodge Swinger, arrest its occupants, and search its contents.
 
 
 25
 Since probable cause existed for the arrests and searches, the warrantless conduct of the police was justified as being responsive to the exigent circumstances created by the moving vehicles. See United States v. Mitchell, 538 F.2d 1230 (5th Cir. 1976) (en banc).
 
 Non-Disclosure of the Informant's Identity
 
 26
 Defendants filed pre-trial motions, which were denied, requesting disclosure of the identity of the informant. At the suppression hearing, defendants' counsel attempted to learn the identity of the informant through cross-examination of the government's witnesses. The district court sustained the government's objection to these questions.
 
 
 27
 The information furnished by the informant had to be corroborated by substantial information gathered by extensive surveillance in order to provide probable cause. The suspicious activity observed during this surveillance which suggested criminal conduct was necessary to provide probable cause. Under these circumstances, appellants have no right to compel disclosure of the informant's identity. See McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); Bourbois v. United States, 530 F.2d 3 (5th Cir. 1976).
 
 
 28
 Appellants further contend that the district court should have held an in camera interview with the informant. A district court in exercising its discretion in determining whether to compel disclosure of the identity of an informant must balance the needs demonstrated by the defendants with the governmental interest in maintaining the secrecy of the informant's identity. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). An in camera hearing may be helpful in balancing these interests, United States v. Doe, 525 F.2d 878 (5th Cir. 1976), cert. denied 425 U.S. 976, 96 S.Ct. 2179, 48 L.Ed.2d 801, but we refuse to adopt a rule requiring a district court to hold an in camera hearing whenever the identity of an informant is requested. The defendants failed to request an in camera hearing and the district court was not required to sua sponte order such a hearing.
 
 Sufficiency of the Evidence
 
 29
 Appellants Pierce and Randall attack the sufficiency of the evidence to sustain their convictions.[4] Pierce and Randall were convicted only of possession of marijuana with intent to distribute. A witness made an in-court identification of Pierce and Randall and testified that they were on the Widgeon when he observed it proceeding up the waterway towards the Kantner residence. He further testified that when the boat was proceeding towards the residence that the waterline painted on the boat was not visible but later that evening when he observed the boat proceeding away from the residence the waterline was visible. From this evidence the trier of fact could conclude that the boat was carrying a heavy load while Pierce and Randall were on board.
 
 
 30
 A bench which had the number 188 stenciled on it in red paint and an index card with the number 94 on it were found on the Widgeon and were admitted into evidence. The index card was similar to other index cards which were contained on each of the bales of marijuana admitted into evidence. One of these bales contained the number 188 on it in red paint and a comparison between the bale of marijuana and the number on the bench shows that the bale was on the bench at a time when the red paint was wet so that the number 188 rubbed off onto both the bale and the bench.
 
 
 31
 While this evidence is circumstantial, it supports a finding that when the Widgeon was proceeding towards the Kantner residence with Pierce and Randall on board, it was heavily loaded with marijuana. The record therefore supports the finding of guilt on the possession count.
 
 Conclusion
 
 32
 The remaining arguments of appellants are without merit. Finding no error, the convictions are AFFIRMED.
 
 
 
 *
 James Noel, Senior United States District Judge for the Southern District of Texas, sitting by designation
 
 
 [1]
 The Open Road camper was not taken from the campground when the Swinger was taken. The record does not reflect whether this camper was ever taken from the campground that night
 
 
 [2]
 The record is not clear whether this Dodge power wagon with the Open Road camper was the same Open Road camper that had been parked at Phipp's Park or whether this was a third camper. If it was the same camper, then it was driven to the Kantner residence subsequent to when the Swinger was transferred. If it was a third camper, there was testimony that the Dodge power wagon had been observed at Phipp's Park and the Kantner residence on previous occasions and had participated in the unusual transfer of vehicles
 
 
 [3]
 Appellants imply that this testimony was fabricated by the police officers. We note that this testimony is corroborated by the actions of the police officers in checking local marinas for these particular boats and by the testimony of other witnesses who had been instructed to watch the waterway for either of these boats
 
 
 [4]
 Appellants Alexander and Toback also attack the sufficiency of the evidence to sustain their convictions. They each received equal concurrent sentences upon their convictions of the possession and conspiracy counts. Their convictions must be upheld if there was sufficient evidence to support either of the counts. United States v. Works, 526 F.2d 940, 948 (5th Cir. 1976). Alexander was arrested in the Dodge Power Wagon-Open Road camper which contained 2211 pounds of marijuana at the time of his arrest. Toback was arrested in the Dodge Swinger camper which contained 1671 pounds of marijuana when he was arrested. Their claims of insufficient evidence are frivolous