**UNITED STATES of America,**
**Plaintiff-Appellant,**

**v.**

**William Robert WOOLERY,**
**Defendant-Appellee.**

No. 80–2156.

United States Court of Appeals,
Fifth Circuit.

March 15, 1982.

Rehearing Denied April 15, 1982.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellant.

Dick DeGuerin, Mike DeGuerin, Houston, Tex., for defendant-appellee.

Before BROWN, GOLDBERG and GEE, Circuit Judges.

GEE, Circuit Judge:

The United States appeals from an order granting a pretrial motion to suppress evidence against defendant William Robert Woolery. The court determined that the officers had illegally arrested Woolery because they did not have the requisite probable cause to arrest.

On August 6, 1979, United States Customs inspectors discovered cocaine secreted in a shipment of saddles from Colombia. The packages were addressed to one Richard Freedman, and a telephone number was listed on the packages. A Braniff Air Line agent called the telephone number, which proved to be that of an answering service, and left a message for Richard Freedman that the shipment had arrived. On the morning of August 9, 1979, a man identifying himself as Richard Freedman called Braniff and informed them that the package would be picked up later that day. "Richard Freedman" also called W. R. Zanes Warehouse and requested that it pick up the saddles from the airline and place them in their storage facility until they could be picked up later that afternoon.

When the warehouse employee showed up at Braniff to pick up the saddles, he was met by agents from the Drug Enforcement Administration ("DEA"), who informed him that cocaine had been smuggled in the saddles. The warehouse employee agreed to help make a controlled delivery of the saddles from the warehouse. The warehouse was then put under surveillance by the DEA agents, Customs agents, and officers from the Houston Police Department. Meanwhile, "Richard Freedman" telephoned the Suburban Delivery Company to arrange for pick up and delivery of the saddles, requesting that a driver meet him in the parking lot of a Denny's Restaurant near the warehouse. At about 2:00 p. m., a man identifying himself as Richard Freedman approached the driver, Lawrence Lopez, and paid him $200 cash for the storage and delivery fees. He directed Lopez to deliver the saddles to a Houston address and to leave the package outside if no one was there. When Lopez arrived in front of the warehouse, the surveillance agents posted inside and outside the warehouse noted that the delivery truck was being followed by a dark Mercedes with two occupants. When Lopez parked the truck and entered the warehouse, the Mercedes stopped directly behind the delivery truck and both occupants turned to look at the truck. They held a brief conversation and then took a left turn into a parking lot directly adjacent to the warehouse, across the street from the truck. After they parked, the driver got out of the Mercedes and, constantly looking at the delivery truck, walked around the rear of the car and went to its front, opening the hood. The surveillance agents testified that during this period the driver never looked at the engine of his car but instead peered through the open hood at the truck.

A DEA agent next directed Lopez to drive his truck to the rear of the building, so he went back outside and started his truck. The driver of the Mercedes then shut the hood and hurriedly entered the car. The truck backed up, drove to the first intersection, turned left, and immediately turned left again into the Zane's Warehouse parking lot. When the Mercedes reached the first intersection, the car stopped, and the occupants looked in both directions as if looking for something. They pulled out into the intersection, stopped again, looked both ways, and held a brief conversation. The Mercedes then turned and pulled up

parallel to Zane's Warehouse, where they momentarily stopped again. The Mercedes then drove around to a parking lot, parking where there was a view of the truck and the warehouse. The surveillance agents radioed this information to the officer in charge.

At the same time, Lopez had entered the warehouse and was interviewed by the DEA agents. Lopez described how "Richard Freedman" had directed him to pick up this package and deliver it to a Houston address. The agents knew that the address was that of the answering service building, because the telephone number of that answering service had been on the package of saddles and had been checked earlier by the agents. The officer in charge then directed the agents to approach the Mercedes and ascertain the identification of the occupants. The agents pulled up behind the Mercedes, blocking its exit. The driver of the Mercedes put his car in reverse and backed into the agents' car. After the impact, the officers closed in on the Mercedes, with guns drawn, and ordered the occupants to get out of the car. When the occupants did not respond, an officer opened the door on the driver's side and observed a pistol in a visible side compartment. The occupants of the Mercedes, one of whom was defendant Woolery, were then arrested. Taken to the nearby Customs office, they were placed in a lineup. Lopez identified Woolery as the "Richard Freedman" who had approached him in the restaurant parking lot.

The district court found that the agents had reasonable suspicion, but not probable cause, as they approached the car. The court ruled that the action of the agents constituted an arrest rather than an investigatory stop. The court therefore viewed this as an arrest not supported by probable cause, and suppressed all evidence that was the fruit of the arrest, including the lineup identification of Woolery by Lopez. The government contends that there was probable cause for an arrest and that the suppression order should therefore be reversed. In the alternative, the government argues that the officers' behavior did not constitute an arrest but was an investigatory stop requiring only "reasonable suspicion." Because we find that there was probable cause to make an arrest, we need not decide whether the actions technically constituted an arrest, and, for purposes of this opinion, we assume that an arrest was made when the officers approached Woolery in the Mercedes.

■ Probable cause for an arrest exists when the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant in a person of reasonable caution the belief that an offense has been or is being committed. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). In dealing with probable cause we deal with probabilities. *Id.* at 175, 69 S.Ct. at 1310. These are not technical considerations, but rather factual and practical ones of every day life on which reasonable and prudent persons, not legal technicians, act. *Id.* A showing of probable cause requires far less evidence than that sufficient to support a conviction. *United States v. Ashcroft*, 607 F.2d 1167, 1170 (5th Cir. 1979). In determining probable cause, we must take into account the experience of the agents. "Conduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer." *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977). "Police officers need not personally observe overt criminal activity to have probable cause. The observation of unusual activity for which there is not legitimate, logical explanation can be the basis for probable cause." *United States v. Alexander*, 559 F.2d 1339, 1343 (5th Cir. 1977).

■ The facts and circumstances of this case justify the arrest of Woolery on probable cause. Inside the warehouse, the officers learned that Lopez had been approached by "Richard Freedman" and that he was to leave a package known to contain cocaine outside of the answering service building that was listed on the package.

Outside, the arresting officers and agents had observed the suspect (1) follow the truck for at least a short distance to the warehouse and park across the street from it; (2) get out of his car, open his hood, and maintain a steady surveillance of the truck with no attention to his car's motor; and (3) follow Lopez to the rear of the warehouse and, once more, position himself to observe the truck and driver. In *Alexander, supra*, this court found probable cause to arrest based on the officer's observation of the suspects' illogical commuting pattern between a state park and their motel. In like vein, the agents in the instant case, though they did not observe Woolery commit an overt criminal act, witnessed the suspect engage in activity centering on known contraband, activity that had no legitimate or logical explanation. Woolery initially provoked suspicion when the agents saw him closely follow the delivery truck to the warehouse and then park across the street from it. Woolery's subsequent behavior, however, warranted more than suspicion. He got out of his car, opened his car hood, and kept a steady watch of the truck without ever looking down at his own car's motor, an obvious pretext. When agents inside the warehouse instructed Lopez to move the truck, Woolery followed it to the rear of the warehouse and from there repeated his patent surveillance. These actions indicated to the agents that the suspect was not experiencing a mere general disorientation as to his location. Rather, Woolery's actions communicated to them his awareness of the delivery truck's smuggling mission. In effect, his conduct was so far removed from the boundaries of normal, legitimate activity that it justified the agents' belief that he was involved in the commission of a crime centered on the drug nexus.

█ The question of probable cause turns on the law enforcement officer's evaluation of reasonable inferences from the facts known to him. *See United States v. Rash*, 424 F.2d 1037, 1038 (5th Cir. 1970). In this case the officer in charge had to make this determination in a relatively short period. The officer did not believe that he could permit the contraband to be taken to another location and simply left on the street, as he knew was projected. To detain the delivery truck much longer might have aroused the suspicion of the suspects. The officer was further convinced that Woolery's conduct foreclosed all explanations compatible with lawful activity. The conduct of the agents in approaching Woolery was, therefore, supported by probable cause, and the evidence obtained after his arrest is admissible against him.

The order of suppression is therefore REVERSED.