**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**San Juanita SANCHEZ,**
**Defendant-Appellee.**

**No. 81–1444**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Sept. 16, 1982.

As Modified Oct. 8, 1982.

Mario J. Martinez, El Paso, Tex., for defendant-appellee.

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

■ The United States appeals from an order granting a pre-trial motion to suppress evidence in its prosecution of defendant San Juanita Sanchez for possessing and conspiring to possess marihuana with intent to distribute it. The district court determined that the warrantless highway stop and search of the truck being driven by defendant was without adequate cause, in violation of her Fourth Amendment rights.[1]

## FACTS

■ The evidence is without conflict and the facts are not disputed.[2] Accordingly, the issue resolves itself into the legal question of whether such facts constitute lawful justification for the stop and search.[3]

On April 21, 1981, the United States Customs Service Patrol Office in Big Bend National Park, Texas received information from an informant that a yellow Ford pickup truck would try to carry a load of contraband into the United States in the area of Presidio, Texas. The informant specified that the contraband would be in a false compartment of "a homemade type" auxiliary gas tank in "the bed" of the truck and, further, that the truck would bear New Mexico license plates, the last four digits of

Sidney Powell, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellant.

1. On appeal, the government seeks to question defendant's "standing" to complain of the stop and search. As the government never raised any issue of standing below, we decline to consider its contentions in this regard and accordingly assume, as all parties did in the trial court, that defendant has sufficient standing. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

2. Though the facts are established, in part, by evidence which would not be admissible at a trial on the merits, such as hearsay testimony, this is not improper at a suppression hearing. *See United States v. Matlock,* 415 U.S. 164, 172–75, 94 S.Ct. 988, 993–95, 39 L.Ed.2d 242, 250–52 (1974).

3. As has been most recently held in *United States v. Ross,* —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the Fourth Amendment's requirements for a warrant *per se,* as opposed to its requirements respecting reasonableness and cause, are generally inapplicable to the stopping of vehicles traveling on the public highways and their consequent search based on probable cause to believe that they contain contraband. Accordingly, the lack of a warrant, as such, is not determinative here.

which would be 8715. This information was disseminated by the Customs Service "headquarters" to all law enforcement officers in the area, including those at the bridge across the Rio Grande between Presidio and Ojinaga.

On May 5, 1981, Customs Patrol Officer Lum, who had been stationed in the area for about eighteen months, and two other officers observed a pickup truck matching this exact description, stopped on the south side of Highway 170, approximately sixty miles east of Presidio and five miles east of Lajitas. Highway 170 runs in a southeasterly direction from Presidio a few miles north of and roughly parallel to the Rio Grande, though in the vicinity of Lajitas its direction becomes more due easterly and it diverges further from the river. The truck was parked at "Lone Draw," an area known to Officer Lum as a pick-up place for contraband, and was occupied by a female driver. This vehicle, driven by a nervous-appearing woman, had come through the port of entry at Presidio "within a day or so" of the time that it was spotted on Highway 170.

The officers, who were wearing uniforms and driving marked vehicles, began a surveillance of the yellow pickup truck which lasted from approximately 4:45 p. m. to 6:30 p. m. The truck remained parked on the shoulder of the road for a short while and then proceeded east on Highway 170 toward the Study Butte area, which is some twenty miles north of the border. Lum could see the auxiliary tank in the bed of the pickup. After stopping at a small grocery store for a few minutes, the truck continued and came to the junction of Highway 170 and Highway 118, turned north on Highway 118, proceeded a few miles, then made a U-turn and proceeded back south to Highway 170, turned west on Highway 170, proceeded ten to fifteen miles, made a U-turn "very slowly and made a couple of stops looking at different areas," continued back east to the Highway 118 junction, and again turned north on Highway 118 and drove toward Alpine, Texas. At that time, Officer Lum returned to his residence and called Drug Enforce-

ment Administration Agent Larry Nichols in Alpine, relayed all the foregoing information, and requested Nichols to assist in the surveillance of the vehicle if it arrived in Alpine. Agent Nichols had been stationed in the Alpine area about three and a half years. Lum, in talking to Nichols, described the informant as reliable, though he did not know the informant's identity.

Upon receiving this information at about 7:40 p. m. on May 5, Nichols, wearing plain clothes and in an unmarked car, drove to downtown Alpine and spotted the described yellow pickup truck at a gas station at the intersection of Highway 118 and Holland Avenue. It was a model of about the year 1972. From his viewpoint, he could tell that the license plates were from New Mexico and that there was a large gas tank in the bed of the truck. A woman was standing near the yellow truck. A red-and-white Dodge pickup truck, also bearing New Mexico license plates, was parked directly in front of the yellow truck and three or four males, including a gas station employee, were working on both trucks simultaneously. While Agent Nichols observed one of the males putting gas in the left rear panel of the yellow pickup, no one put gas in the auxiliary tank. Three of the males got into the red-and-white truck and the single female got into the yellow pickup. The yellow truck pulled out of the gas station first, closely followed by the red-and-white truck. Several blocks down the road, the red-and-white truck passed the yellow truck, but both continued in very close tandem with no vehicles in between.

As the trucks continued east on Highway 90, Agent Nichols approached them from behind and then slowly passed each vehicle. At this time he was able to verify the license plate numbers of the yellow truck as matching those given him by Officer Lum. As he passed the yellow truck, Agent Nichols focused on the auxiliary gas tank and determined that it appeared to be "overly sized" for its normal application, "much larger than most vehicles use as an auxiliary tank," and that although there was a gas connection fitting on the top of the tank, it

did not appear to be connected to the engine compartment or to the cab of the truck. He could not observe any fuel line running from the tank. Even though he drove slowly beside the driver while passing the yellow truck and looked directly at her, she continued to stare down the road and completely avoided eye contact, which he considered to be unusual. Nichols then slowly passed the red-and-white pickup truck in which the three males were riding, recorded the license number, and noticed that the driver appeared nervous and was passing glances between the agent and his rearview mirror.

After passing the trucks, Nichols pulled over to the side of the road and allowed both vehicles to pass. The yellow truck continued to follow the red-and-white truck very closely. "About a mile or so" outside of Alpine, Nichols reapproached the trucks and determined they were traveling approximately thirty-five miles per hour on a four-lane segment of Highway 90 where vehicles normally travel at least as fast as the fifty-five mile-per-hour speed limit. When he came within thirty or forty yards of the yellow truck, it "darted" to the shoulder of the road as if the woman driving wanted him to pass. At that point, Nichols made up his mind that he "was going to stop the yellow pick-up" and likely search the auxiliary gas tank. He turned on his siren and followed the yellow truck, then traveling about forty-five miles per hour along the paved shoulder, until it stopped approximately three quarters of a mile up the highway. The red-and-white truck "accelerated at a high rate of speed" and escaped, traveling "much faster" than previously.

When the yellow truck came to a stop, Nichols identified himself to the driver and asked to see her driver's license, which she cooperatively produced. The license identified her as the defendant, San Juanita Sanchez. He asked where she was coming from and she replied Ojinaga, Mexico. As he was talking with Ms. Sanchez, Nichols could clearly see the auxiliary gas tank in the bed of the yellow pickup. Again he saw no connection between the gas tank and the bed or body of the truck. Nichols made some preliminary investigations of the tank, including tapping on its side, which indicated the presence of a separate compartment, and observing that it was only very loosely attached to the bed of the truck. He then pulled the tank slightly to the rear and lifted it, at which point three bags of marihuana, one in clear plastic, rolled out of its false compartment. Nichols thereupon placed Ms. Sanchez under arrest.

Nichols was unaware of the informant's identity. He had learned, apparently after the arrest, that the informant had not previously relayed information, but "because of who the person was that supplied the information he was considered reliable, he or she."

Officer Lum and Agent Nichols were the only witnesses testifying at the suppression hearing. Photographs of the truck and tank were introduced. The tank has a "homemade" type appearance, is approximately the width of the truck, slightly higher than the sides of the bed and seems to be about two- to three-feet front to back.

## DISCUSSION

The district court granted defendant's motion to suppress the seized evidence because "the stop and subsequent search of Movant was totally without probable cause."[4] The court found that the information received from the informant had become "stale" in the two-week interval between the April 21 "tip" and the May 5 surveillance of the defendant. In addition, it found that certain of the factors personally observed by Agent Nichols—the two trucks driving thirty-five miles per hour in a fifty-five miles-per-hour zone, the pres-

---

4. The government did not argue at the suppression hearing, and it does not suggest on appeal, that this was either a border search or a roving-patrol stop. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d

607 (1975); *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Therefore, it is undisputed that Agent Nichols must have had probable cause to search the auxiliary gas tank.

ence of an auxiliary fuel tank, and the defendant's refusal to look at the agent as he drove past her—were insufficient to re-establish the probable cause required to search the truck.

On appeal, the government argues that, under the circumstances of this case, Nichols was justified in stopping Ms. Sanchez and had the requisite probable cause to search the auxiliary gas tank. We agree and reverse the grant of defendant's motion to suppress.

■■■ The questions presented by this appeal are narrow ones. First, the district court erroneously declared the informant's "tip" to be stale due to the two-week lag between its reception by the Customs Service and Officer Lum's initial observation of the defendant's vehicle. Staleness, or time-liness, of information upon which probable cause is based "must be determined in the light of the particular circumstances of each case." *United States v. Diecidue*, 603 F.2d 535, 560 (5th Cir. 1979) (citations omitted), *cert. denied sub nom. Antone v. United States*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). Here the description of defendant's vehicle was fourteen days old when the truck was spotted on Highway 170, approximately sixty miles east of Pre-sidio, Texas, the port of entry specified by the informant. Moreover, the informant had not specified a date as to when the yellow pickup truck would enter the United States, and fourteen days is an entirely reasonable period in which to expect the tip to remain viable.

In *United States v. Barfield*, 507 F.2d 53, 57–58 (5th Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975), this Court approved a search warrant issued for-ty days after information as to the location

of stolen coins and burglary tools was re-ceived by the F.B.I. *See also United States v. Rosenbarger*, 536 F.2d 715, 719–20 (6th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977) (time lapse of twenty-one days between infor-mant's observation of illegal activity and issuance of search warrant not fatal).[5]

Second, the district court's finding that no probable cause existed for the search, premised in part upon its determination that the informant's tip had become stale, was also erroneous. "Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy in-formation [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332 (1959) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925)). "A showing of probable cause requires far less evidence than that sufficient to support a convic-tion." *United States v. Woolery*, 670 F.2d 513, 515 (5th Cir. 1982) (citation omitted). This Court has recognized that probable cause is determined from the "totality of the circumstances and the inferences that flow therefrom," and that where there is substantial communication among the law enforcement personnel the relevant cogni-zance is "the collective knowledge of the police officers," rather than the sole knowl-edge of the officer performing the search, in this case Agent Nichols. *United States v. Clark*, 559 F.2d 420, 424 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). *See United States v. Sutton*, 636 F.2d 96, 99 (5th Cir. 1981).

**5.** Defendant's reliance on the ten-day time limit specified by F.R.Cr.P. Rule 41(c)(1) is mis-placed. The period in question is expressly related *only* to the time between *issuance* and *execution* of a warrant, not to the currency at any time of the information upon which the decision to issue the warrant is made. Since the drafters of the Rule were obviously aware that the underlying information upon the basis of which the magistrate determines to issue the warrant cannot possibly be contemporaneous

with its issuance, the Rule plainly implies that information *in excess* of ten days' old is *not* necessarily "stale" for execution purposes. If any precise maximum period for "staleness" of underlying information at the time of search is to be inferred from the Rule, it would seem to be twenty days. Actually, however, the deci-sions in *Diecidue, Barfield*, and *Rosenbarger* are inconsistent with basing any determination of timeliness of underlying information on the provisions of Rule 41(c)(1).

While information supplied by an informant of unknown reliability, standing alone, clearly does not establish probable cause under *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), corroboration of that information by "independent observations [either] substantiating the details of the tip [or] . . . of activity reasonably arousing suspicion itself" may establish the requisite level of cause to warrant a search. *United States v. Brand*, 556 F.2d 1312, 1318 (5th Cir. 1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763 (1978).[6] Here, there was corroboration of both kinds. Every detail of the informant's tip was corroborated by the surveillance of Officer Lum and Agent Nichols. The vehicle spotted on May 5 was a yellow Ford pickup truck bearing New Mexico license plates with the last four digits of 8715 and carrying a "homemade" appearing auxiliary gas tank in the bed of the truck. As specified by the informant, the vehicle had entered the United States through the Customs point at Presidio, Texas. Further, as discussed below, there were other circumstances, independent of the tip, which in themselves reasonably tended to arouse suspicion, and hence indirectly furnished additional corroboration of the tip. The corroboration in this case is analogous to that found sufficient in *United States v. Mendoza*, 547 F.2d 952 (5th Cir.), *cert. denied*, 431 U.S. 956, 97 S.Ct. 2679, 53 L.Ed.2d 273 (1977).

Respecting the independently suspicious circumstances, there was, to begin with, the fact that the yellow truck was parked off Highway 170 in the "Lone Draw" area, which was known as a pick-up place for contraband. Further, the subsequent erratic movements of the truck after the grocery store stop, its several U-turns over a considerable stretch of highway, and its stops along Highway 170 "looking at different areas," followed by its again heading toward Alpine on Highway 118, do not suggest an ordinary traveler. Rather, they tend to reinforce the suspicion, aroused by the previous parking in an area known as a contraband pick-up location, of an attempt to effectuate a clandestine meeting. These stretches of highway are obviously not normal places for conventional prearranged meetings between separately traveling vehicles. Nor are we dealing with an area shown to contain multiple crossroads. The New Mexico license plates on the yellow truck, coupled with its meeting at Alpine with the red-and-white truck, also having New Mexico plates, militate against the likelihood that the yellow truck's erratic movements along the several miles each side of the junction of Highways 170 and 118 were for the purpose of locating a fixed ultimate destination in that area. Further, the route taken from Presidio by going east on Highway 170, north on Highway 118, and then, with the other truck, east on Highway 90, is not suggestive of a return to New Mexico from Presidio.

The fact that the gas tank in the truck bed had no fuel line and was not connected to the cab or engine compartment, coupled with its being "overly sized" and "much larger than most vehicles use as an auxiliary tank," gave independent grounds for suspicion, as well as corroborating the tip that the contraband would be concealed in a false compartment of such a "homemade" type tank. While we do not doubt the complete accuracy of the learned trial judge's observation that "many vehicles in this part of the country utilize auxiliary tanks due to the lengthy distances West Texas travellers are required to endure," the referenced circumstance in no way dilutes the relevance of this particular tank's oversized character and lack of connections, particularly in light of the informant's tip. We are also mindful that on cross-examination Nichols answered "yes" when asked if he was "familiar with the practice in the

**6.** *See also United States v. Hirschhorn*, 649 F.2d 360, 363 (5th Cir. 1981), where we stated, "[A] tip of unknown reliability may be corroborated and shown to be reliable through independent investigation that corroborates in material respects the information given by the informant." (Citations omitted.)

Alpine area, and this entire portion of the United States that fronts, and is adjacent to the Republic of Mexico" of people "going into the Republic of Mexico to buy gasoline and diesel fuel" because it was cheaper, and that he stated the tank in question could have been "a transport container" instead of an "auxiliary tank." However, there was no evidence that the tank's size was within customary limits for a "transport container" or, indeed, that there was customarily any different type of tank mounted in truck beds for transport, as distinguished from auxiliary tank, purposes. Moreover, here we are dealing with a vehicle having New Mexico license plates, coming into the United States at Presidio. There is no indication that the truck came from a portion of New Mexico close to the Mexican border. The round-trip road distance between the closest New Mexico point and Presidio is easily in the range of four hundred miles, which tends to make it unlikely that the purpose of the trip was to load this tank with "cheap" fuel.

The conduct of the two trucks leaving Alpine and proceeding east on Highway 90 was likewise suspicious. The activities at the gas station, the way the trucks pulled out of it, and their relationship to each other as they proceeded east along Highway 90, all indicated that these two New Mexico licensed pickup trucks were traveling together. Yet, in one there was a lone female driver with no passenger, while three men occupied the other pickup. This is certainly an uncommon division of passengers on a joint trip, the significance of which is enhanced by the fact that the single occupant, the female, was in the vehicle with the suspect tank. The drivers of both vehicles appeared nervous when they saw Nichols observing them. The trucks were traveling at an unusually slow rate of speed for this segment of the four-lane highway. The yellow truck's "darting" off the highway when Nichols again approached from the rear was also mildly suspicious. Moreover, the "tandem" traveling and a "lead car-load car" order of proceeding was at least of some significance in a suspected smuggling operation, even though the distance between the vehicles when Nichols observed them was apparently not sufficient for the lead vehicle to be of very great value as a "scout." *See United States v. Villarreal*, 565 F.2d 932, 934–36 (5th Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978).[7]

■ Finally, there are the facts occurring after Nichols turned on the siren and before he commenced search of the yellow truck, the most prominent of which is the immediate rapid flight of the red-and-white truck. Of some, though lesser, relevance are the yellow truck's long-continued driving on the shoulder, at the same or a higher speed as previously, before finally stopping, the driver's statement that she had come in from Ojinaga, and Nichols' confirmation that the tank was not connected. Since these events took place after the siren's signal to stop, they may afford support for the subsequent search *only* if the stop was lawful. *United States v. Frisbie*, 550 F.2d 335, 338 (5th Cir. 1977). However, it is settled that "probable cause" is not necessary for an investigative *stop*, "reasonable suspicion" being all that is required. *United States v. Costner*, 646 F.2d 234, 236 (5th Cir. 1981). We hold that the informant's tip, together with the other circumstances outlined in the foregoing paragraphs, formed a more than sufficient basis for Nichols' reasonable suspicion that the yellow truck contained marihuana. We note that in *Costner* this Court held that the stop of the Plymouth in which Costner was a passenger was validly based on reasonable suspicion and that Costner's flight when the vehicle stopped enhanced that suspicion to the level of "probable cause" sufficient to support his arrest.[8]

---

7. The *Villarreal* opinion indicates that during a portion of the "lead car-load car" procedure sensors indicated "[t]wo vehicles were traveling east on Ranch Road 170 within seconds of each other" and "[b]oth vehicles began traveling north on State Highway 118 within seconds of each other." 565 F.2d 934 n.2.

8. "Although reasonable suspicion is insufficient to justify an arrest, additional facts that develop after a legal stop may create the

Of course, in *Costner* the arrest was of the person fleeing, while here the flight of the red-and-white truck is used to justify the search of the yellow truck. This distinction renders the relevant inferences from flight less strong here than in *Costner*, but only slightly so, for here the activities witnessed at the filling station and the subsequent travel of the two vehicles in tandem clearly gave Agent Nichols probable cause to believe that these two New Mexico vehicles in Brewster County, Texas, were on a common enterprise.

We hold that the above factors, taken together and viewed as a whole, with each reinforcing the other, sufficed to provide probable cause for the search of the yellow truck.

Defendant relies on *United States v. Orona-Sanchez*, 648 F.2d 1039 (5th Cir. 1981), and *United States v. Villamonte-Marquez*, 652 F.2d 481 (5th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2902, 73 L.Ed.2d 1312 (1982), but each presents a significantly weaker case for the government than that here. In *Orona-Sanchez* there was no informant's tip whatever, and nothing comparable to the oversized and unconnected gas tank or the several U-turns made by the yellow truck after being parked in the area known for marihuana pick up; nor was there any indication the vehicle had come from the border. In *Villamonte-Marquez*, although there was a tip, it in no way was directed to the searched sailboat, and there was no nexus between the other suspicious circumstances and the boat; the

boat engaged in no suspicious movements and had no suspicious physical characteristics.[9]

We do not, of course, infer that the factors we have relied on would individually be sufficient, even for purposes of "reasonable suspicion." We do not suggest that any driver who avoids eye contact or otherwise appears nervous when passed by an officer after coming from a suspicious area near the Mexican border can be stopped, *United States v. Orona-Sanchez, supra*, or that any west-Texan with a disconnected auxiliary gas tank in his truck is free game for such treatment. Nor do we announce any rule of "three U-turns and you're out." After all, what we deal with here is a corroborated informant's tip plus other interrelated suspicious circumstances. These factors are not to be viewed in isolation. They are not like links forming a chain which is no stronger than the weakest of them. Rather, they resemble the several strands of a rope, each reinforcing the other. Here, the total is greater than the sum of its parts. *See United States v. Clark, supra*.[10] Moreover, our ultimate inquiry is not whether there is some hypothesis of the yellow truck's "innocence" which is reasonably consistent with the circumstances shown, for such an analysis is more appropriate to the "beyond a reasonable doubt" standard used on the merits. Here, we are dealing with "probable cause," which requires "far less evidence," *United States v. Woolery*, 670 F.2d at 515. All that is required is a show-

---

probable cause necessary to effectuate an arrest. *United States v. Hall*, 557 F.2d 1114, 1117 (5th Cir. 1977), *cert. denied*, 434 U.S. 907, 98 S.Ct. 308, 54 L.Ed.2d 195 (1977). . . . Following the legal stop of the Plymouth, the fleeing of Costner from the officers was a sufficient additional factor to increase their reasonable suspicion to probable cause to arrest Costner." *United States v. Costner*, 646 F.2d at 236.

**9.** Nor in either of these cases was there the circumstance of flight, as here. However, as *Orona-Sanchez* and *Villamonte-Marquez* were "reasonable suspicion" stop cases, and not "probable cause" searches, we do not rely on the absence of flight as a significant basis on which to distinguish those decisions.

**10.** In *Clark* we stated:

"While the defendants have stressed how innocuous and unsupportive of probable cause each fact is if taken alone, we do not view the evidence in that manner. As now Chief Justice Burger has stated, '[p]robable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the "laminated" total.' *Smith v. United States*, 123 U.S.App.D.C. 202, 358 F.2d 833, 837 (1966). Viewing the evidence in this manner it may truly be said that the total may be a sum greater than its parts." 559 F.2d at 424.

ing of "facts and circumstances [that] would lead a reasonably prudent man to believe that the vehicle contain[ed] contraband." *United States v. Clark,* 559 F.2d at 424; *United States v. Wright,* 588 F.2d 189, 193 (5th Cir. 1979).

We hold that the facts and circumstances shown, taken together, establish probable cause. Here, there is no conflict in the evidence, and the facts are not disputed. In such a situation, we have not hesitated to reverse an order of suppression. *United States v. Woolery, supra.*

Accordingly, the cause is reversed and remanded.

REVERSED AND REMANDED.

ON SUA SPONTE RECONSIDERATION
PER CURIAM:

On *sua sponte* reconsideration we eliminate from our prior opinion in this case the following language in footnote 3 thereof, namely:

"The defendant has the burden of establishing that the complained of stop or search was illegal. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556 [2561], 65 L.Ed.2d 633, 641 (1980)."

The above-referenced sentence hereby deleted is not material to our prior opinion herein or to our disposition of the case. Nor does it relate to a matter which was the subject of dispute between the parties either at trial, or on appeal. Under these circumstances, we believe it inappropriate for us to express opinions on the subject to which the sentence hereby deleted relates. Except as hereby modified our prior opinion remains in effect. Our prior order disposing of this case is unaffected by the instant action.