**UNITED STATES of America**

v.

**John Oscar LUCK, Ralph Larry Pace, William Page Vicary, Gene Claude Easterling, Lewis Franklin Crump, Charles Donald Boldin, and Johnny Ray Moore, Defendants.**

**Crim. A. No. CR82–36R.**

United States District Court,
N.D. Georgia, Rome Division.

Feb. 18, 1983.

---

Steven R. Wisebram, Asst. U.S. Atty., Atlanta, Ga., for plaintiff.

Victoria D. Little, Decatur, Ga., for Luck.

Steven W. Ludwick, Atlanta, Ga., for Pace.

Calvin A. Leipold, Jr., Decatur, Ga., for Vicary.

Bobby D. Wilson, Atlanta, Ga., for Easterling.

Joseph M. Salome, Atlanta, Ga., for Crump.

W. Michael Maloof, Decatur, Ga., for Boldin.

Jerome Froelich, Jr., Atlanta, Ga., for Moore.

## ORDER

HAROLD L. MURPHY, District Judge.

This Order sets forth in writing the Court's findings of fact and conclusions of law in denying the defendants' motion to suppress.

### I

Defendants Luck, Pace, Vicary, Easterling, Crump, Boldin and Moore were arrested at or in close proximity of the LaFayette Municipal Airport in LaFayette, Georgia, in the early morning hours of October 25, 1982. A recently-landed plane and four automobiles were seized, and two of the automobiles seized on the airstrip contained duffle bags filled with 633 pounds of cocaine, wrapped in numerous plastic bags.

Defendants subsequently were indicted for importation and possession with intent to distribute the cocaine, and for conspiring to commit both acts. They made timely motions to suppress all evidence and effects seized at the airport, primarily contending that there was no probable cause to arrest the defendants, and thus, that all items eventually seized, including the cocaine, should be excluded from their trial as the fruits of their illegal arrests. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ The Court heard evidence on December 1–4, 10, 13 and 14, 1982. Because the arrests and searches were conducted without a warrant, the Court placed upon the Government the burden of proving that the arrests were supported by probable cause, *Mincey v. Arizona,* 437 U.S. 385, 390–391, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *Williams v. United States,* 382 F.2d 48 (5th Cir.1967); the burden then shifting to the defendants to establish violations of their Fourth Amendment interests to those items seized or searched, other than those taken from them personally. *See United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980).

The novel procedural development during the motion to suppress requires the Court to set forth its findings of fact in a manner that it ordinarily would not. As will be discussed, following its presentation of evidence on probable cause to arrest, the government rested. Before proceeding with their production of evidence, defendants demanded a ruling from the Court on the issue of probable cause, resulting in the denial of their suppression motion. Five of the defendants rested at this point, seeking to rely on the record as it then stood. Two defendants proceeded to try to establish that the evidence upon which the government sought to rely was not credible, and to force disclosure of the government's informant. Other defendants then "rejoined"

the case during the "standing" portion of the hearing.

The Court, of course, is convinced that its initial order denying the motion to suppress based on the want of probable cause is correct. The Court also concludes that, because the focus of the probable cause inquiry was the knowledge and perspective of the arresting officers (which the Court may glean from the record as a whole), the attempt to limit the admissibility against the five "resting" defendants was ineffective, and all subsequent probable cause evidence was admissible against them. Nonetheless, the Court will review its finding of fact on a witness-by-witness basis, so that the record first is analyzed at the time of the original order, and then by consideration of subsequent evidence.[1]

## II

The government's first witness was FBI Special Agent J. Wayne Sturdivant. He testified that he spoke with Mike Ellis, the LaFayette airport manager, on October 5, 1982. Ellis related to Sturdivant that on that date, sometime after 2:00 p.m., a Navajo Panther aircraft, tail number N808PC, flew into the airport. The plane was piloted by "Chuck" (later identified as defendant Boldin), who was accompanied by "Larry" (later identified as defendant Pace). (Transcript of proceedings of December 2, 1982, at page 15) (hereinafter referred to as T 12/2 at 15). Ellis further stated that Chuck and Larry worked on the plane, with Larry taking the seats out of the airplane and putting them in the hangar. At one point, Chuck went into town seeking a hydraulic connection to aid in putting a fuel bladder in the plane. (T 12/2 at 16). Ellis described the plane as burnt orange in color with a brown stripe. He further told Sturdivant that Chuck and Larry left LaFayette about 4:00 or 4:30 p.m., Chuck leaving in the plane to go to Michigan, and Larry leaving in a late model white Chevrolet. (T 12/2 at 19).

On October 6, 1982, Sturdivant was at the airport from 5:00 or 5:30 p.m. on, to act as security for Ellis and to see the people if they returned. (Boldin previously had told Ellis that he would return on October 6.) Shortly thereafter, Pace arrived at the airstrip in a blue Buick, Georgia license NCC713. Sturdivant overheard Pace tell Ellis that he got lost on the way from Atlanta.

At about 8:00 or 8:15 p.m., N808PC returned, piloted by Boldin, who was accompanied by "Bill" (later identified as defendant Vicary) and one "Dennis". The plane landed from north to south and taxied back to the fuel pumps in front of the airport office. During the evening, Vicary was in and out of the office, viewing aeronautical charts, drinking coffee, and making small talk. Pace and Boldin were working on the plane, taking a panel off the bottom of the plane and filling the bladder with fuel. The individuals left at about 11:45 p.m., Pace leaving in the Buick and Boldin, Vicary and "Dennis" departing in the plane. Sturdivant testified that Vicary told Ellis that he was going to the Bahamas and wanted Ellis to go with him. (T 12/2 at 23).

Sturdivant further testified that he was at the airport investigating allegations that these individuals were going to transport cocaine in from out of the country (T 12/2 at 24), and that that information came from an informant (T 12/2 at 25).

On October 20, 1982 (Wednesday), Sturdivant again talked with Ellis, who told him that N808PC had flown in, piloted by Boldin, who this time was accompanied by his 14 or 15 year old son, Don. Ellis related that Boldin asked whether his friends were there (at the airstrip), and that Boldin further stated that he was supposed to have met them at the Atlanta airport. (T 12/2 at 27). Boldin told Ellis that he would be leaving, and would be back Friday night (October 22), to put the seats back in the plane on Saturday, and purchase more fuel. Ellis told Sturdivant that he took Boldin

---

1. The Court notes that some references to the record are from transcripts; however, since the complete record is not transcribed, some references are from the Court's notes, and indicated by the date the evidence was received.

and his son to the Surrey Motel in LaFayette, that Boldin gave Ellis $1000 for fuel, and after Boldin registered at the motel, Ellis left.

Sturdivant further related that Officer Jewel of the Georgia State Patrol told him that he checked the Surrey Motel Saturday morning and saw the blue Buick, license number NCC713, parked there. Ellis told Sturdivant that around 4:00 a.m. on October 21 (Thursday), he heard two planes leave from the airstrip. When he went to the airport, N808PC was gone.

Special Agent Harold Poe testified next. He stated that he was a certified pilot with an instrument commercial rating. He said that surveillance of the LaFayette airstrip was undertaken on Friday night, October 22, 1982. Although Poe personally was not present that night, he testified that some vehicles and people were there.

On October 23, Poe was conducting surveillance of the airport, along with other law enforcement officers, from a mobile home trailer on the north end of the airstrip. He arrived at about 7:30 p.m. He testified that about one hour later, four cars in parade-like fashion came past the airport office area, pulled onto the airstrip, and drove down the runway for a few hundred yards. The autos backed into the fence on the west side of the airstrip, and turned their headlights out. Although he did not see any of the vehicles well enough to identify them, he testified that he saw a person fitting the description of Boldin and a person later identified as defendant Easterling at the restroom and office area. He also testified that at about 10:00 p.m., he saw two people, not attached to the surveillance squads, milling around on the ramp. They came running out from the front of the hangar and hid behind a corner, looking down the flight line as if something had frightened them. After thirty seconds, they returned to the cars. (T 12/2 at 36). At around 2:00 a.m., the four vehicles turned their lights on, pulled up the runway

and left. Surveillance was broken off shortly afterwards.

Poe stated that on October 24, he came to the airport trailer shortly before dark and resumed surveillance. He observed three cars enter the airport through the same gate as the previous night, go down the runway in almost the same manner, to about the same place, back in towards the fence, and turn their lights off. (T 12/2 at 37). He stated that during the course of his surveillance he saw Boldin and two individuals identified later as Luck and Crump, use the restroom. He also saw Boldin use the phone a couple of times Saturday and Sunday nights. (T 12/2 at 38).

At about 12:10 a.m. (October 25), Poe saw a person appearing to be Boldin run from the office/telephone area, down the runway to where the cars had been seen earlier. Poe communicated this to various surveillance teams in the area.

At 12:20 a.m., a plane landed from the north with its landing light on. The plane was soon out of Poe's line of sight. (T 12/2 at 39). However, he heard on the radio from Agent Futrell, located east of the runway about half way down the airstrip, that two cars went onto the runway and followed the plane south, and that the plane had turned around and was heading back north. (T 12/2 at 39). Futrell also communicated that, while the plane was travelling south, somebody in his vehicle said that the door was open on the plane's left side, that all the lights on the plane except the cabin light had been extinguished and that the vehicles following it also had their lights out. (T 12/2 at 40).[2] Futrell further notified Poe that the plane and the cars were travelling north on the runway.

At that point, Poe testified, he left the trailer and saw Boldin walk from the office area to the plane, where he met a person wearing a light-colored windbreaker exiting the plane. Both walked back to the office area. Poe went around the west side of the hangar where he saw Boldin and defendant

---

2. Poe testified that it was, in his experience, unusual to turn the lights out on a plane while it is on the runway. "It would be the same to me as parking on the interstate with your lights off." (T 12/2 at 43).

Vicary (wearing a light-colored windbreaker) sitting in the blue Buick, parked by the office door. They were ordered out of the car and placed under arrest. In plain view was some luggage on the back seat of the blue Buick, and on the front seat, a CB radio and 2 blue VHF transceivers tuned to 122.85. Poe testified that the 122.0 to 123.0 frequency is reserved for unicom or aviation frequency communication.[3]

On cross-examination, Agent Poe testified that a Chattanooga, Tennessee, detective, located in the trailer, identified defendant Crump when the latter was standing near the restroom. (T 12/2 at 53). He further stated that the agents had information that a drug plane was coming in and "everything that the information had purported to be true seemed to be falling into place." (T 12/2 at 54). However, he admitted that the decision to arrest had been made previously, that is, to arrest those persons present if an airplane in fact landed and events confirmed the information possessed by the arresting officers. (T 12/2 at 55–56). In this regard, it took the plane between two-and-a-half and three minutes to taxi back, Poe stating that "something happened to it down there to keep it from taxiing back at its regular time." (T 12/2 at 57).

In addition, agent Poe testified that he had been receiving and transmitting information over the radio, and that he radioed the other surveillance crews that were to make arrests to go ahead, that "they're dumping it on the runway because it was taking too long." (T 12/2 at 66). He also reiterated that while some pilots cut off their landing lights to conserve power, they don't necessarily turn off their position lights or rotating beacon. (T 12/2 at 70). Moreover, he stated that 122.8 is the most commonly used unicom system at airports without a control tower, not 122.85. (T 12/2 at 73–74). Poe further stated that although he originally was to be the officer who gave the order to arrest, in actuality, "as soon as everyone let known or made

known what they had seen, ... Mr. Millard's (the case agent) the one actually said go ahead, because we became concerned that the length of time that had elapsed before the airplane came back that something had happened on the runway rather than back at the ramp where we hoped it would happen." (T 12/2 at 78).

On redirect, agent Poe stated that he saw that the plane which landed on Sunday and pulled to the gas pumps was N808PC. On recross, he testified that the fact that the lights went off was relayed to him over the radio. (T 12/2 at 82).

Chuck Severs of the Georgia Bureau of Investigation was the government's next witness. On the night of the arrests, he was located on a side street west of the airstrip with other law enforcement officers. When notified (over the radio) that the plane had landed, his group moved closer to the runway, locating near some bushes west of the airstrip. He then was told to move in and make arrests.

Once on the runway, he observed a white Oldsmobile with the doors open; two persons were standing around the car. Severs said he told both persons to identify themselves and raise their hands. One individual, near the driver's side rear panel, was observed doing something with his hands in front of his body; after the officers yelled at him several times to raise his hands, he did, dropping an object to the ground. (T 12/2 at 96). That person later was identified as defendant Luck, and the object dropped later was determined to be a plastic bag of cocaine wrapped in a handkerchief. (T 12/2 at 97). Defendant Moore was the other person arrested at the Oldsmobile.

On cross-examination, Severs stated that the arresting command was "to go take the deal down." However, he stated that the arresting officers previously had the description of the vehicles. (T 12/2 at 99). He also testified that no other airplane landed before the order to arrest was given, and that about five to ten minutes elapsed

---

**3.** At this point in the hearing, Agent Poe diagrammed the LaFayette Airport scene, especial-ly as to the placement of the surveillance squads.

between the time he saw the airplane fly in and the arrest order was communicated. (T 12/2 at 108). The area was dark, the closest fixed lights being at the hangar area 75 to 100 yards to the north, but the flashlights of the numerous officers illuminated the area.

The government next called Robert McAllister of the LaFayette City Police Department SWAT (Special Weapons and Tactics) squad. On the night of the arrests, he was stationed with other members of his SWAT team and FBI Agent Futrell on the southeast side of the runway. He testified that he saw the plane coming in, that it turned its landing light on for a few seconds, but that after it touched down, it turned its landing lights off. (T 12/2 at 111). About two to five minutes after touch down, two light-colored cars followed the plane south on the runway with their lights out. (T 12/2 at 112). McAllister went west about 100 feet where the rest of his SWAT team was waiting by a dump truck, and told them to "saddle up". (T 12/2 at 112). All this time, agent Futrell was communicating his observations to the other squads over the radio.

He testified further that, as the plane taxied back north towards the hangar and fuel pumps, his dump truck pulled north onto the runway in between the two vehicles that followed. After following the plane and first car for about 20 seconds, the lights of the dump truck were turned on, shining on the first vehicle. That car made a sharp turn to the west. As the dump truck passed this vehicle, McAllister saw two people get out of this first car, described as a white automobile. He fired six to eight rounds from his automatic rifle into the air. Almost simultaneously, he heard rounds coming over his head and the muzzle report from a weapon from the car behind the dump truck. (T 12/2 at 113–114). The SWAT team members returned the fire, at which time this automobile (identified as a Ford LTD) veered to the right (east side of the runway) (T 12/2 at 117). The dump truck continued north to secure the aircraft. (T 12/2 at 114).

On cross-examination, McAllister testified that the plane remained on the south portion of the runway for five minutes after the two cars followed it down there. (T 12/2 at 121).

On re-direct, McAllister related that after securing the aircraft, he returned to the area of the Ford LTD to search for stragglers. (T 12/2 at 131). Based upon information that the occupants of the Ford fled into the nearby underbrush east of the runway, a tracking dog was brought from the Walker County Correctional Institute. Starting near the pond to the east of the airstrip, the dog lost the scent, indicating that the person who fled had crossed the pond. After going to the far side of the pond, the dog tracked from north to south, eventually finding defendant Easterling, who initially identified himself as "George Washington." (T 12/2 at 134). Then, after the dog handler led his dog back to the area of the Ford LTD, it was only a few minutes later that defendant Pace was found in the brushy area a few yards in front of where the Ford LTD had been abandoned.

Further examination of McAllister disclosed that he had been advised previously that the expected airplane was equipped with a "Panther Kit," which he described as special engines designed to lower the noise level of the aircraft, and was told the plane's number. (T 12/2 at 151–152). On the night of the landing, McAllister and his crew were advised by radio that the aircraft was 15 minutes away from the airstrip. (T 12/2 at 147). Approximately 15 minutes later, the plane landed. (T 12/2 at 150). After the landing, the squad received orders to pull onto the runway and take the plane. (T 12/2 at 148). McAllister also explained that, although agent Futrell told them to get ready to take *this* plane, there is not much traffic at the LaFayette airport at 1:00 or 1:30 in the morning. (T 12/2 at 152–153).

At this point, agent Sturdivant resumed the stand. He stated that on the night of October 24–25, he was stationed directly east of the beacon light in a construction area, off of the southeast portion of the

runway. Three to four minutes after the plane landed, he pulled onto the runway (with his emergency lights, blue light and headlights on) and headed north toward the hangar. The Ford LTD was abandoned on the right side of the airstrip, the left rear tire flat and the driver's door open. He parked his vehicle near the LTD, with his head lights facing the bushes to the right of the airstrip. In a few minutes, defendant Crump came out of the bushes and surrendered. After all was secured, the vehicles were taken to the hangar and searched.

The government concluded its case with agent Poe, who testified that he observed no automobiles on the airstrip when he resumed surveillance on October 24. At about 6:30 p.m. (after dark), three cars drove down the runway in the manner described previously. (T 12/2 at 184). Agent Poe did not see any of the automobiles leave the airstrip. (T 12/2 at 184). He further testified that he could not identify any of the cars as they entered nor could he see the blue Buick, parked near the office, from his vantage point in the trailer. Poe related that case agent Millard, who was monitoring all the radio traffic, gave the orders to arrest the defendants. (T 12/2 at 191). He further stated that, as the plane was coming in, he saw the landing lights on, but that the officers stationed in the construction area at the southern end of the runway would have had better opportunity to view the plane.

At this juncture, the government rested as to its burden of proof as to probable cause to arrest. After initially rejecting the defendants' request for a ruling, the Court issued an oral ruling from the bench, denying the motion to suppress. The ruling was predicated on events and knowledge of the arresting officers prior to the automobiles swerving and any shots being fired. The Court found various factors tending to show that probable cause existed to effect the arrests: the seats taken out and a bladder installed; Vicary's invitation to Ellis to travel to the Bahamas (indicating the plane's foreign mission); the seats being placed in the hangar and Boldin's statement that he would return to replace them; the

information that cocaine was to be brought in; various people hanging around LaFayette airport late at night a number of consecutive nights; the automobiles repeating their entrance procedure two nights in a row; the message that the plane was 15 minutes out, partially corroborated with one individual's scurry down to the parked automobiles at the same time; the landing of the plane 15 minutes later; the tail number of the landed aircraft the same as the one in which the bladder was installed; the aircraft cutting off all of its lights upon landing; the door on the plane being opened; the cars following the plane without lights; and the delay in taxiing back to the hangar. A key factor was that observations of the agents corroborated the information of the informant or informants. The Court further stated that the report of the informant that cocaine was coming in was not a necessary element to the validity of this arrest but was a circumstance to be considered in view of the other activity occurring before and near the time of the arrest.

Thereafter, all defendants except Luck and Boldin rested. The Court then heard testimony from witnesses called by defendants Luck and Boldin, after which there were no doubts remaining as to probable cause to arrest.

Agent Sturdivant testified that the FBI had information from a confidential informant that drugs were to be imported into the country via the LaFayette airport, but that the information was transmitted only to agent Millard.

Mike Ellis, manager of the LaFayette Municipal Airport, stated that he spoke with law enforcement officers at various times in 1982 concerning drug smuggling at the airport (T 12/3 at 6), but that he never was the source of this sort of information.

In October, Ellis agreed to cooperate with the FBI on the investigation that developed into this case. Agent Millard called Ellis on October 5 and asked whether Ellis had fuel for a Navajo airplane. (T 12/3 at 19). After Ellis replied affirmatively, Millard said

he would be back in touch. Millard called again, stating that a plane would be coming in and that some people would be there to meet the plane in a few minutes. He asked whether Ellis would cooperate and not ask questions. Millard told Ellis that the plane would be in for some fuel and to have some work done on it. He also told him that one of the persons would act as if he knew Ellis, and that this person would pay him for the fuel. (T 12/3 at 20). Ellis also testified that Millard may have told him what kind of car the people would arrive in.

A little later, a white Chevrolet with two males arrived at the airport. One person, temporarily referred to as the Thin Man,[4] approached Ellis as if he had known Ellis for some time and told him that the plane was on its way (T 12/3 at 18). He also asked him where the plane could park. The other occupant of the car, referred to at the motion hearing as the Fat Man,[5] remained seated in the car.

A few minutes later the plane arrived. (T 12/3 at 22). One or both of the white Chevrolet occupants went to meet the plane. At one point, the Thin Man approached Ellis, asking whether there was a place in town to get a hydraulic connection. Boldin got into the white Chevy with the Thin Man and the Fat Man and went to see if this connection could be found, Pace remaining at the airport.

A little later, they returned from town, unsuccessful in their attempt to find the needed part. The Thin Man told Ellis that the plane would leave for awhile, evidently in hopes of finding the connection elsewhere. He also asked if and where the aircraft seats could be stored, and Ellis told them that they could store them in the hangar. (T 12/3 at 25). The seats were removed and stored, and the Thin Man paid Ellis $1000 for fuel for the plane. Millard had told Ellis that he would be paid for fuel, but on this day, the plane was filled with only 100 gallons, far less fuel than $1000 could buy.

On October 6, Millard or Sturdivant called Ellis and told him that the plane would arrive shortly. Sturdivant wanted Ellis to pick him up in LaFayette and carry him to the airport for surveillance purposes. Once at the airport, Pace arrived alone in the blue Buick. Millard called, requesting Ellis to transmit the car's tag number. Pace asked Ellis if the plane had arrived, thinking that he was late since getting lost on the way from Atlanta. Pace said that he came to the airport to meet someone.

The plane landed about one hour after Pace's arrival. Pace met "Chuck" (Boldin) and two others, "Bill" (defendant Vicary) and "Dennis". They worked on the plane, Sturdivant telling Ellis that they were installing the bladder. (T 12/3 at 41). Later that evening, Ellis saw that the bladder had been installed. Ellis allowed them to fill the outside tank and the bladder with fuel (a total of 324 gallons). All together, the defendants remained at the airport four to five hours. In the meantime, Ellis engaged in a lot of small talk with some of them, particularly about flying and specifically about an airplane crash which Vicary narrowly survived. Ellis also noted his displeasure of being in the plane as the bladder was filled with fuel, because of the fumes; Pace agreed.

The defendants left as they came, Dennis, Vicary and Boldin flying to Michigan, and Pace exiting in the blue Buick. Upon watching the plane leave, Pace remarked to Ellis that his (Pace's) job was done. (T 12/3 at 48).

Around October 20, 1982, Millard called Ellis and said the plane would return, that it would need more fuel, and that again, Ellis should ask no questions. (T 12/3 at 50–51).

On the 20th, the plane arrived after dark, piloted by Boldin who was accompanied by his son Don. Boldin asked if anybody was there to meet him. He claimed he was there to fill the plane with fuel, and that someone else would fly it out the next day.

4. Not to be confused with movie actor Dick Powell's long-time role.

5. Not to be confused with Sidney Greenstreet.

Boldin filled the plane with over 300 gallons of fuel, commenting that "Its ready for them," or words to that effect. He asked Ellis what he was paid for fuel before, and after Ellis responded, Boldin paid him $1000. Boldin also asked Ellis whether the airport was open on Saturdays, because he would return to put the seats back in the plane and buy more fuel. Ellis said that he could make arrangements for Boldin to get into the hangar where the seats were stored on Saturday. Ellis then took Boldin and his son to a local motel. The next morning, the plane was gone.

On October 21, 1982, Millard called Ellis to find out his plans for the weekend, stating that the plane was due back during the weekend. Millard or Sturdivant told Ellis that the plane would contain narcotics and they wanted to know what procedure Ellis used in closing the airport in the eventuality that the plane came in. (T 12/3 at 61). Millard also asked Ellis to see if law enforcement officials could use Mrs. Ache's trailer at the airport's north end for surveillance.

On Saturday, October 23, Millard or Sturdivant told Ellis the plane would be in that evening and asked him if he minded staying at the airport later than usual. Ellis said no.

Later that evening, Boldin along with others in several automobiles came to the airport and drove down the runway. Boldin used the airport restroom. The Thin Man came by and told Ellis he was not needed, so Ellis left.

On Sunday, October 24, 1982, Millard called Ellis and said the plane would be in that night, and that Ellis would be needed to close the airport if the plane did arrive.

After dark, Boldin came to the airport, used the restroom and sat in his car. He asked Ellis about the seats and Ellis showed them to him in the hangar. Boldin said that the plane would be in and would need more fuel. (T 12/3 at 68).

Ellis also saw Pace that evening. Later, Ellis went to a restaurant for dinner, and when he returned, saw other people sitting in Boldin's car. The Thin Man came by and said Ellis was not needed. The Thin Man had just come from the blue Buick where the others were seated, and said to Ellis that they would need $500 of fuel. The Thin Man paid Ellis $500, which he apparently got from those in the blue Buick.

Ellis then left, but travelled around La-Fayette with Sgt. Deboard of the Georgia State Patrol. It was over Deboard's radio that Ellis heard that the aircraft had landed.

Ellis also testified that this procedure (police stakeout in anticipation of a drug plane landing) had been implemented back in January or February of 1982.

On cross-examination, Ellis testified that Vicary asked him to go to the Bahamas with him. He also claimed that Vicary stated that they might as well write what they were doing on the side of the plane, it being so obvious what they were up to. (T 12/3 at 93). Ellis gave a statement of his observations to the FBI. (T 12/3 at 49–50).

On December 4, 1982, agent Al Millard, the case agent, was called to testify. He stated that this case had been part of a two to three month investigation that jelled only four to six weeks prior to the arrests. He testified that it was he who made the arrangements to send people to the airport on October 5, having talked to the Thin Man by telephone earlier that day. The Thin Man at that time had been working for Millard, having been a source of information for about one year. (T 12/4 at 18).

He testified that the Thin Man (called a "source" by Millard) gave Millard nonspecific information about plans of another person to bring cocaine into the country. Accordingly, Millard told his source to go to the airport on October 5 as the Fat Man, otherwise known as Fat Larry, told him to do, and to call Millard when he left. Millard told the Thin Man to go to the airport and do whatever Fat Larry wanted him to do.

Millard testified that the source had relayed information to him that the plane would contain a load of cocaine. This infor-

mation was developed over a six week period prior to the arrests, in that the source told Millard that he was in contact with the person trying to set this up. (T 12/4 at 37). Millard was told that an aircraft had become available, but that the specific plane was not known until N808PC was flown in by Boldin on October 5. (T 12/4 at 38). Later, during the weekend of landing, Millard had a squad of officers stake out the LaFayette airport, based not only on the source's information, but on Boldin's comments that the plane would return then. (T 12/4 at 35).

Millard also testified that the source had given information on other cases, specifically about the proposed landing of a marijuana-laden plane at the LaFayette airport in February and March or April, 1982. Although the plane did not come in, Millard claimed that this information was corroborated by other means, and that the source's information always was reliable. For example, a U-haul truck showed up at the airport two nights during this marijuana operation and left later, presumably because the plane did not arrive.

Moreover, after the March stakeout, the source provided information to Millard about persons involved with narcotics. Millard passed the information along to state or local law enforcement officials who, based on the information, arrested three or four persons and recovered marijuana plants and a quantity of cocaine. (T 12/4 at 111–113).

Returning to discussion of the present matter, Millard testified that on October 24, 1982, the source was at the airport at LaFayette at the request of Fat Larry. Millard was in his car one and one-quarter miles from the airstrip. Millard had supplied the source with a walkie-talkie so that he could stay in contact with him (it was set on Millard's frequency), but the source was instructed not to use the device from the scene. (T 12/4 at 56).

For sometime, the Court had denied disclosure of the identity of the informant to the defendants under *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). At this point in the proceedings, however, the Court ordered disclosure of the informant, for it had become readily apparent that the informant was not a "tipster" or bystander, but a person somewhat involved in the unfolding drama.

In this regard, Millard identified one Charles Dee Scott as his informant and claimed that Scott had provided information for over a year upon which arrests had not been effected, based in part on the desire to preserve Scott as a confidential informant.

Millard then testified that Scott called him six weeks before the events to say that he knew a person that was trying to arrange a load of cocaine and find a place to land. He asked Millard if he was interested in arranging this place. (T 12/4 at 102). Millard told Scott that he knew of a person to be contacted and that Scott should tell his person that arrangements could be made. At various times, Scott also told Millard that the people bringing in the cocaine had found a pilot and organized a ground crew, but Scott did not know the individuals at that time. (T 12/4 at 119.).

Millard also testified that he sent Scott to the airport to speak with the defendants, and Scott told Millard that the plane was 15 minutes out.

All the defendants then rested as to probable cause, and some put up evidence to establish standing. Only Boldin established "standing" to items not taken from his person, and the contents of the luggage seized from the trunk of the blue Buick was suppressed as to him. In the course of this phase of the hearing it was learned that the trunks of the LTD and Oldsmobile were opened briefly after the arrests to determine if they contained cocaine. Moreover, Sturdivant's team believed the plane had stopped on the runway because of the direction of the vapors seen emanating from the plane and reflecting in the beacon light.

### III

■ There can be no dispute that following the second (defendants Luck's and Bol-

din's evidence of probable cause) and third ("standing") phases of the motion to suppress hearing, the record is sufficient to permit the Court to find that there was probable cause to arrest the defendants. Probable cause exists if " 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Elsoffer,* 671 F.2d 1294, 1298 (11th Cir.1982); *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1964) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). *See also United States v. Preston,* 608 F.2d 626, 632 (5th Cir.1979); *United States v. Perkins,* 608 F.2d 1064, 1067 (5th Cir.1979).

■■■ Moreover, if this case is viewed strictly as an "informant's case," in that the information leading to the formulation of the officers' reasonable belief is supplied by an informant, the adequacy of such information must be tested by the two-prong analysis of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). First, the officers needed to be informed of some of the underlying circumstances from which the informant concluded that his information was accurate. Second, the agents also must be able to show some of the underlying circumstances from which it could be concluded that the informant was "credible" or his information "reliable". *Goodwin v. Balkcom,* 684 F.2d 794, 818–819 (11th Cir.1982); *United States v. Squella-Avendano,* 447 F.2d 575, 579 (5th Cir.1971).

Under this standard, the probable cause test is satisfied. The informant Scott's knowledge was based on contacts with the person who was organizing the smuggling operation (presumably "Fat Larry") and some of the defendants themselves. In addition, Scott had been the source of reliable information in the past, including the aborted February-March 1982 smuggling opera-

tion; the arrest of persons and seizures of marijuana plants, described previously, and to some extent, agent Millard's testimony that an ongoing investigation had not culminated in arrests partly due to the need to keep Scott's identity a secret.

Moreover, Scott's information on this case was corroborated by observations of the agents. N808PC did fly into LaFayette airport on October 5, 1982, to be worked upon, have the seats removed, and have the bladder installed. The agents also had advanced warning that the plane would return on October 20. In addition to many other factors to be listed later, the crucial indicia of reliability of Scott was established with his information that the plane would land in 15 minutes. Fifteen minutes later the plane did land.

Nonetheless, this is not a case in which the government relied strictly upon its informant to satisfy the burden of probable cause. For whatever reason, the government failed to meet the standards set by *Aguilar-Spinelli.* The Court therefore will analyze its initial order separate from *Aguilar-Spinelli.*

### A.

■■■ At the time the government rested, it is clear that the two-pronged test of *Aguilar-Spinelli* had not been satisfied. There was no indication in the record of how the informant obtained his information, whether by first-hand observation or otherwise. Furthermore, the reliability of the informant was unknown until the further stages of the proceedings.

Nonetheless, *Aguilar-Spinelli* does not provide the only platform upon which rests probable cause in this case. In *United States v. Squella-Avendano,* 447 F.2d 575 (5th Cir.1971), the court analyzed the use of tips insufficient under the two-pronged *Aguilar* test:

In *Spinelli v. United States* the court stated that an informant's tip that did not meet *Aguilar's* requirements literally could nevertheless be used to justify a search or arrest if "it [can] fairly be said that the tip, even when certain parts of it

have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration." After noting insufficient support in a search warrant affidavit for the affiant's assertion that the information was reliable (*Aguilar's* second test), the court went on to conclude, after detailed analysis, that there were not sufficient indications in the record that the information had been gained in a reliable way (*Aguilar's* first test). In so doing, there was developed a three-tiered method of analysis for testing whether Aguilar's requirements had been met. First, if the information provided is in such "detail" and "minute particularity" that "a magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way," then the report, if sufficiently incriminating, may, without more, be grounds for finding probable cause. Secondly, less detailed information from a reliable source may be used as grounds for a finding of probable cause if independent investigation by law enforcement agencies yields sufficient verification or corroboration of the informant's report to make it "apparent that the informant had not been fabricating his report out of whole cloth." Corroboration must render the report "of the sort which in common experience may be recognized as having been obtained in a reliable way." *Thirdly, even a report that is not under the above two standards sufficient of itself to establish probable cause may count in the magistrate's determination of probable cause, but only as one of a number of other factors of "further support" tending to show probable cause. Examples of satisfactory "further support" given in Spinelli involved law enforcement agencies' knowledge of independent facts which suggest criminal conduct or of facts which take on an aura of suspicion in light of the informant's tip.* United States v. Squella-Avendano, supra, at 579–580 (footnotes omitted) (emphasis supplied); *United States v. Tuley,* 546 F.2d 1264, 1267–1268 (5th Cir.1977).

The instant case concerns only the third test set forth in *Squella-Avendano.* This being the case, it is necessary to determine whether the circumstances observed or reported to the law enforcement agents during their surveillance were suspicious enough to provide probable cause. *United States v. Alexander,* 559 F.2d 1339, 1343 (5th Cir.1977). In this context, even though the tip was not of sufficient reliability to establish probable cause by itself, that does not mean "that the tip was so insubstantial that it could not properly have counted" in the determination of probable cause. *Spinelli v. United States, supra,* 393 U.S. at 418, 89 S.Ct. at 590. The reliability of an otherwise defective tip may be established for purposes of *Aguilar-Spinelli* if independent investigation by law enforcement officers yields sufficient verification or corroboration of the information from the confidential source. *United States v. Alexander, supra; United States v. Mendoza,* 547 F.2d 952 (5th Cir.1977); *United States v. Tuley,* 546 F.2d 1264 (5th Cir.1977); *United States v. Brennan,* 538 F.2d 711 (5th Cir.1976); *United States v. Anderson,* 500 F.2d 1311 (5th Cir.1974). As the Court held in its bench ruling, the confidential informant may be considered along with other factors to show probable cause. *United States v. Alexander, supra; United States v. Tuley, supra; United States v. Squella-Avendano, supra.*

A brief summary of the government's evidence establishes that the FBI had received information from a confidential source that cocaine would be transported into the United States at the LaFayette airstrip. On October 5, 1982, certain individuals arrived at the airport in N808PC and an automobile. Some of these people worked on the airplane, removing the seats and placing them in the hangar, and attempting to install a fuel bladder. A greater amount of fuel was paid for than received. After trying unsuccessfully to acquire a hydraulic connection to aid in the installation of the bladder, defendant Boldin flew the plane elsewhere in order to secure the needed part. Returning the next

day, defendants Pace and Boldin were seen installing the fuel bladder, and filling it with fuel. Defendant Vicary, on hand during this work, asked Ellis, the airport manager, to go to the Bahamas with him.

On October 20, Boldin returned to the airport in N808PC, accompanied by his son. He told Ellis he needed to fill the plane with fuel (the bladder was still in place) so that others could fly it out. He stated, however, that the plane would be back on October 22, and that Boldin wanted to reinstall the seats on October 23. Again, a greater amount of fuel was paid for than actually received. Ellis took Boldin and his son to a local motel.

Later a Georgia State Patrol officer noticed that a blue Buick, license number NCC713, in which defendant Pace arrived at the airport on October 6, was parked at this motel. Early in the morning of October 21, Ellis heard two planes leave the airport; when he arrived at the airstrip later in the morning N808PC was gone.

Thereafter, law enforcement officers, based in part on Boldin's statement that the plane would return on October 22, began surveillance of the airstrip on that night. Various persons and vehicles were seen, but not identified, at the airstrip that night.

On October 23, surveillance was resumed. When Agent Poe arrived, the airstrip was deserted. After dark, four automobiles in parade-like fashion came into the airport lot, turned south onto the runway, travelled down a distance until they backed in towards a fence and extinguished their headlights. Boldin and Easterling were observed that evening. At one point, two persons were seen hiding behind the hangar, as if frightened or startled by something, prior to returning to the area where the cars were parked. After the vehicles left at about 2:00 a.m., surveillance was broken off.

The next night, the stakeout continued. Three cars entered the runway in the exact fashion as the previous night, turning off their headlights after backing towards the fence on the south portion of the airstrip. During the night, Boldin, Luck and Crump were seen. Boldin also was seen using the phone.

At about 12:10 a.m. (October 24), Boldin was seen running down the airstrip to where the cars were parked. At about this time, the surveillance squads, in communication by radio or walkie-talkie, also were informed that the plane was 15 minutes out.

Fifteen minutes later, N808PC came flying in from the north. The squad had been told that this was the expected plane's tail number. It was observed to have its landing lights on for only a few seconds; then, all lights were turned off except for the cabin light. As it taxied south, the door was open. Two of the automobiles followed it south, with their headlights also off. There was a delay in the plane taxiing north towards the hangar, giving rise to an indication that the cargo was being dumped on the runway, and not near the hangar as originally expected. The plane began taxiing north, followed by the automobiles; none had any lights on. The order to arrest was given after this information was transmitted to all the squads, and within the next few hours, all seven of the defendants were arrested at the airstrip or in the thick brush just to the east of the tarmac.

With this factual background, the Court concludes that probable cause existed at the time of the order to "take the deal down". The Court notes first that where there is at least minimal communication between different officers, the "collective knowledge" of the officers is looked to in determining probable cause. *United States v. Butler,* 611 F.2d 1066, 1070 n. 11 (5th Cir.1980); *United States v. Agostino,* 608 F.2d 1035, 1037 (5th Cir.1979). *See also United States v. Clark,* 559 F.2d 420 (5th Cir.1977); *United States v. Vasquez,* 534 F.2d 1142, 1145 (5th Cir.1976). In this regard, the record is clear that Agent Millard monitored all radio traffic, and that the surveillance squads broadcast their observations.

Second, the Court finds it proper to take judicial notice that LaFayette is located in the rural north Georgia moun-

tains, and is sparsely populated (pop. 6,517; 1980 census). The "airport" is a single one-mile long runway. Further, it was elicited at the hearing that there is rarely any activity at the LaFayette airstrip at 1:00 a.m. The "lateness of the hour, [and] the rural unpopulated setting . . . provides additional weave to [the] fabric of probable cause." *United States v. Agostino, supra. See also, United States v. Long,* 674 F.2d 848, 853 (11th Cir.1982). Moreover, probable cause must be judged not with the logic of cold steel, but with a common sense view to the realities of everyday life. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *United States v. Agostino, supra; United States v. Tinkle,* 655 F.2d 617, 621 (5th Cir.1981).

■ Thus, where insufficient information about the tip and the tipster is available to justify reliance upon it alone, investigating officers may supplement the tip by surveillance of the subject or corroboration of key elements of the tip from relatively objective sources. Although there is no consensus on the type of information required to corroborate an informant's tip, it is generally agreed that the better practice is to obtain corroboration of incriminating details. *See Spinelli v. United States, supra,* 393 U.S. at 414, 89 S.Ct. at 588; Moylan, *Hearsay and Probable Cause: An Aguilar and Spinelli Primer,* 25 Mercer L.Rev. 741 (1974). However, an accumulation of innocent detail conforming to the original tip has been held to have corroborative value. *United States v. Brennan, supra* at 720 (citation omitted). *See also, Bailey v. United States,* 386 F.2d 1, 3 (5th Cir.1967) ( [T]he veracity of an unknown informant can be sufficiently determined by the searching officers' personal observation of some activity which is consistent with the tip but which would appear harmless without it); *United States v. Kent,* 691 F.2d 1376, 1381 (11th Cir.1982) (vessel boarding; quoting *Bailey*); *United States v. Tuley, supra* at 1268 ( . . . [W]hile these matters considered separately might not be a sufficient basis for probable cause, when the agents considered their combined cumulative effect, sufficient probable cause was present).

*United States v. Alexander, supra,* provides instructive guidance. A customs officer was told by a first-time informant that a shipment of 10,000 pounds of marijuana would be brought into the Stuart, Florida area the first week of March, 1975. He said it would be brought in by boat and transferred to vans. Later, the informant said the load would come in up the south fork of the St. Lucie River.

On March 1, 1975, the Martin County Sheriff's Department was told to investigate some "suspicious" persons staying at the Holiday Inn in Stuart. They were ill-kept persons, but had lots of cash. Only one of four license plates numbers listed by these persons on the hotel registration cards matched the actual vehicles. (This investigation was completely independent of the one regarding the drug operation).

Customs told the sheriff's department about the possible smuggling operation the same day. Believing that there might be a connection between the smuggling operation and the hotel guests, the sheriff's department began surveillance of these individuals.

The next day, the attendant at a campground near the area of the proposed smuggling operation called the sheriff's department about certain vehicles (including vans) at his campground which were not registered, but appeared to be abandoned. Police placed the vehicles under surveillance.

On March 3, one of the Holiday Inn guests drove to the campground and exchanged his vehicle with one of the abandoned vans, returning then to the motel. Late that night, the van, previously at the campground, and two other of the vehicles at the Holiday Inn were driven to a residence near the area of the suspected drug drop-off. Another of the campground vehicles also was driven to the residence. At 5:00 a.m., two of the vehicles were driven back to the campground and abandoned. Later that day, a vehicle from the Holiday Inn was driven to the campground, and the two vehicles abandoned in the morning were driven back to the residence. Later,

these vehicles were taken back to the campground and abandoned, the other vehicles returning to the motel.

The informant at first told the customs officers that the delivery would be made that night, but then called back and said it was cancelled due to bad weather or boat problems.

On March 5, the customs officer told the sheriff's department that the delivery would be made after dark, and that one of the boats would be the Capricorn. However, at the suppression hearing, the officer said he got his date and time information from his source, but failed to say where he received the name of the delivery boat. He later told his colleagues that the second boat would be the Widgeon, but failed to testify as to the source of that information as well.

That night, the Widgeon was spotted coming up the St. Lucie towards the residence. One of the camper vehicles from the campground went to the residence. Other cars from the motel shortly joined it.

Although the residence was under surveillance, the officers could not see the waterway. However, they did hear the revving of a boat's engines from that area. The vehicles left the property. When learning by radio transmission that the vehicles left, the police pursued then, stopped them, and arrested the occupants. Bales of marijuana were found inside the vehicles. At the trial level, the search was upheld and the defendants were convicted.

On appeal, the court found a failure of proof by the government as to the verification of the tip. While the Widgeon's arrival up the St. Lucie was verified by observation of the officers, the customs officer never testified as to where he received the advanced notice of the names of the vessels. "While it may be likely that he received this information from the informant, the government's failure to present testimony to this effect makes it impossible to find that the reliability of the tip was sufficient-

ly established by corroboration." 559 F.2d at 1343.

■ Therefore, the court held, it was necessary to determine whether the circumstances observed by the police officers during their surveillance were suspicious enough to provide probable cause. In this regard, the Stuart smuggling operation, as in this case, "ultimately unfolded before" the surveilling officers. *Id.* Based on numerous factors, the *Alexander* Court found probable cause. First, the vehicles' movement between the campground and the residence "was not normal, innocent activity but rather was suspicious activity which suggested criminal conduct."

Police officers need not personally observe overt criminal activity to have probable cause. The observation of unusual activity for which there is no legitimate, logical explanation can be the basis for probable cause.

*Id.* Defendants' arguments in this case to the contrary, multiple-night appearances at the rural LaFayette airstrip, especially when accompanied by parking down the runway with no headlights, or following a lightless plane without headlights, is not logical, innocent conduct.

Second, the *Alexander* Court noted the gathering of vehicles at the residence and the sound of the boat on the waterway. Third, all the vehicles in *Alexander* left the residence simultaneously, but in different directions.

Moreover, the abnormal activity at the rural airstrip here indicated that criminal conduct was afoot. First, the plane landed at a deserted, basically unlit airstrip,[6] with its landing light on for just a few seconds. As it proceeded south, its door was open. The automobiles followed south without headlights, and after a delay, the plane taxied north without lights, followed by the automobiles, which were still without lights. Although innocuous enough individually, this cumulative activity gave color and corroboration to the informant's tip. The

---

**6.** Although there were lights by the hangar and a beacon light on the south portion of the runway, the testimony established that the area was basically dark.

Court holds that these facts and circumstances gave rise to probable cause to enter the airstrip area, stop the vehicles and arrest the defendants.

### B.

Perhaps a more troubling issue is the effect of the further presentation of evidence by defendants Luck and Boldin on those other defendants who asserted a right to rest upon the record following the close of the government's probable cause evidence.

 The starting point of analysis must be the traditional rule set out in *Gouled v. United States*, 255 U.S. 298, 312–313, 41 S.Ct. 261, 266, 65 L.Ed. 647 (1921), that the trial court may reconsider its pretrial denial of a motion to suppress upon objection to the admission of the evidence at trial of the case. *See also, United States v. Jones*, 438 F.2d 461, 467 (7th Cir.1971) ("[W]here matters appearing at trial may cast reasonable doubt on the pre-trial ruling it becomes the duty of the trial judge to consider the issue of suppression *de novo*.")

 On the other hand, if the motion to suppress is granted, the evidence generally is not admissible at a subsequent hearing or trial, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); and generally, the prosecutor is barred from seeking reconsideration of the grant at trial. *See McRae v. United States*, 420 F.2d 1283 (D.C.Cir.1969); *United States v. Koenig*, 290 F.2d 166, 171 (5th Cir.1961), aff'd *sub nom. DiBella v. United States*, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962). *But see, United States v. Dieter*, 429 U.S. 6, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976).

Neither of these general rules, however, casts light on the issue before the Court. First, neither rule concerns multiple stages of a pretrial suppression hearing. Nor do they involve a strategic split among jointly-tried defendants.

Arguably relevant is *United States v. Tuley*, 546 F.2d 1264 (5th Cir.1977). In his dissent, Circuit Judge (now Chief Judge) Godbold took the majority to task for relying on the District Court's order denying the suppression motion. That case involved multiple searches, with the three final searches "piggy-backed" upon the initial search's validity. 546 F.2d at 1268 n. 6. The written order filed one month after the denial of the motions contained references to an affidavit of a police officer prepared after the initial search, in support of a search warrant application for the later searches; however, this affidavit was never introduced at the hearing during consideration of any of the searches. In the written order, the affidavit was used to support a finding of probable cause as to the first search. Judge Godbold criticized the "cavalier fashion" with which an issue of constitutional dimension was handled, stating that the court bolstered the evidence after all the hearings were over and after its decision had been announced. "Had Tuley's counsel known that the affidavit, though not in evidence, was to be considered he could have examined [the officer] on why the statement in his affidavit was broader than his oral testimony, and which of the two was correct, and why he prepared an affidavit to be sworn to by [another agent]." *Id.* at 1270 (Godbold, J. dissenting).

The Court has considered Judge Godbold's views, but finds *Tuley* inapposite. The Court is not basing its ruling on any evidence not introduced at the hearing. In fact, the Court has made all efforts to separate the evidence presented at the various stages of the proceedings.

 More important, it is the Court's view that the issue in a probable cause hearing is the knowledge of the arresting officer(s) at the time of the arrests. Certainly, had the Court initially granted the motion to suppress and the government sought reconsideration in a timely manner and before trial, the Court would have been obliged to reconsider the decision in light of new evidence. *See McRae v. United States, supra*, at 1288; *United States v. Dieter*, 429 U.S. 6, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976). That defendants Luck and Boldin sought

"reconsideration" by attempting to "smoke out" the government's informant, while all other defendants sat at defense table awaiting the benefits of the unravelling of the government's secrets, should not cause a different result.

In addition, had the searches or arrests in this case resembled *Tuley, supra,* where three or four searches were dependent upon the validity of the first, perhaps the Court could find substance to the "resting" defendants' arguments. However, the evidence adduced either before or after the five defendants asserted a right to rest establishes that this was an all-or-nothing operation—either probable cause existed to arrest all the participants of the smuggling attempt, or it did not.

The Court believes that a relevant analogy would be found in *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Clearly, *James* plays no part in a motion to suppress. Otherwise, for example, Boldin's statement that the aircraft would return on October 22 would not as easily be admissible against the remaining defendants (who were not present when the statement was made) during the subsequent motion to suppress. However, that statement is admissible against all the defendants at the suppression hearing, as another part of the foundation of probable cause, because the focus of the inquiry is not upon Boldin's culpability, but upon whether, under all the circumstances, the knowledge of the arresting officers would " 'warrant a man of reasonable caution in the belief that' an offense has been or is being committed". *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1964) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)).

Thus, assuming *arguendo* that the government failed to prove the existence of probable cause in the first instance, the entire record of the hearing may be relied upon, and does establish, that the law enforcement officials had probable cause to arrest these defendants.

ACCORDINGLY, the motions to suppress are DENIED.